*Exhibit A*

**AFFIDAVIT IN SUPPORT OF VERIFIED COMPLAINT FOR CIVIL FORFEITURE *IN REM* OF APPROXIMATELY $404,802.42 IN UNITED STATES CURRENCY FROM WALWORTH STATE BANK ACCOUNT ENDING IN 6358, *et al.***

I, Daniel S. Schmeichel, being first duly sworn on oath, do hereby depose and say:

**Introduction**

1.      I am employed as a Special Agent with Internal Revenue Service - Criminal Investigation ("IRS-CI") and have been since February 2010.  As an IRS-CI Special Agent, my duties include the investigation of criminal violations of Title 26 (the Internal Revenue Code), Title 31 (the Bank Secrecy Act), and Title 18 of the United States Code, as well as civil and criminal asset forfeiture provisions related to these statutes.

2.      I am a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia, where I received training in various law enforcement topics, including federal criminal law, techniques for investigating drug crimes and financial crimes, and legal procedure.  I am a graduate of IRS-CI's Special Agent Investigative Techniques training program, through which I received training in investigating financial crimes and tax crimes, asset seizure and forfeiture, and money laundering methods.  I have also completed advanced training programs presented by the Department of Justice, Department of Homeland Security, and IRS-CI related to investigating asset forfeiture and money laundering offenses.  I hold a Bachelor of Science degree in Consumer Science with an emphasis in Business from the University of Wisconsin – Madison and a Master of Business Administration degree from the University of Wisconsin – Eau Claire.

3.      This affidavit provides information gathered in a joint investigation conducted by the Walworth County Drug Enforcement Unit ("WCDEU"), Drug Enforcement Administration

("DEA"), and IRS-CI.   Specifically, DEA Special Agent Matthew McCarthy, who is an active

participant in this investigation, has provided me with information related to, among other things,

the Controlled Substances Act,[1] drug investigations in general, analogue controlled substances,

and synthetic cannabinoids, including AB-FUBINACA, PB-22, and 5F-PB-22.  Special Agent

McCarthy has been a Special Agent with the DEA for over 11 years, and I believe him to be

truthful and reliable.

> 4.      This affidavit is based upon my personal knowledge and investigation, and upon

information that other federal, state, and local law enforcement officers, all of whom I believe to

be truthful and reliable, have related to me in the course of their official duties.  I have also

obtained information from interviews, controlled purchases, surveillance, public and open-source

records, business records, financial records, and undercover meetings with some of the targets of

the investigation.

> 5.      I submit this affidavit in support of a Verified Complaint for Civil Forfeiture *in
rem* against the following defendant properties:

> > a.      Approximately $404,802.42 in United States currency from Walworth
> > State Bank account ending in 6358 held in the name of The Smoke Shop,
> > LLC (hereinafter "WSB6358");

> > b.      Approximately $371,295.46 in United States currency from Walworth
> > State Bank account ending in 1625 held in the name of The Smoke Shop,
> > LLC (hereinafter "WSB1625"); and

> > c.      Certain real property commonly known as parcel number NA328000002
> > in Walworth County, Wisconsin, which is further described as Lot 2 of
> > Certified Survey Map No. 3280 recorded in the office of the Register of
> > Deeds for Walworth County, Wisconsin, on December 21, 2000, in
> > Volume 18 of Certified Survey Maps, on Page 205, as Document
> > No. 458442, located in the NE 1/4 of the NW 1/4 of Section 3, Town 2
> > North, Range 18 East, Town of Lyons, Walworth County, Wisconsin
> > (hereinafter "parcel number NA328000002").

---

[1] Title 21, U.S.C. § 801, *et seq.*

6. On or about April 4 and 5, 2014, investigators from the WCDEU and DEA seized the defendant properties WSB6358 and WSB1625, respectively.

7. Based upon information I believe to be truthful and reliable, I submit that David Yarmo, Erin Yarmo, and the business that these individuals ran – The Smoke Shop LLC – have conspired to knowingly and intentionally distribute, and have knowingly and intentionally distributed, products containing Schedule I controlled substances, and controlled substance analogues of Schedule I controlled substances, in violation of 21 U.S.C. §§ 802(32)(A), 813, 841, and 846 (possession with intent to distribute controlled substances and controlled substance analogues, conspiracy to distribute controlled substances and controlled substance analogues) and have also engaged in money laundering offenses, in violation of 18 U.S.C. §§ 1956 and 1957 (money laundering by conducting financial transactions to conceal the proceeds of illegal narcotics activity, money laundering by spending more than $10,000 in proceeds of illegal narcotics activity).

8. Based upon information I believe to be truthful and reliable, I further submit that the defendant properties approximately $404,802.42 in United States currency seized from WSB6358 and approximately $371,295.46 in United States currency seized from WSB1625 were used or intended to be used in exchange for Schedule I controlled substances, controlled substance analogues of Schedule I controlled substances, or both; represent proceeds of the knowing and intentional trafficking in Schedule I controlled substances, controlled substance analogues of Schedule I controlled substances, or both; or were used or intended to be used to facilitate knowing and intentional violations of Title II of the Controlled Substances Act, all in violation of 21 U.S.C. §§ 802(32)(A), 813, 841, and 846.

9.      Based upon information I believe to be truthful and reliable, I further submit that the defendant real property, parcel number NA328000002, was purchased with proceeds traceable to an exchange of money for Schedule I controlled substances, controlled substance analogues of Schedule I controlled substances, or both, in violation of 21 U.S.C. §§ 802(32), 813, 841(a), and 846.

10.     Based upon information I believe to be truthful and reliable, I further submit that the defendant properties approximately $404,802.42 in United States currency seized from WSB6358, approximately $371,295.46 in United States currency seized from WSB1625, and parcel number NA328000002, were involved in transactions or attempted transactions in violation of the Money Laundering Control Act, or are traceable to money laundering offenses, all in violation of 18 U.S.C. §§ 1956 and 1957.

**PB-22 and 5F-PB-22**

11.     PB-22 is the common short name for the chemical compound 1-pentyl-1*H*-indole-3-carboxlic acid 8-quinolinyl ester.  5F-PB-22 is the common short name for the chemical compound 1-(5-fluoropentyl)-1*H*-indole-3-carboxylic acid 8-quinolinyl ester.

12.     Based on my consultation with DEA agents familiar with analogue controlled substances, I know the DEA asserts that, based on scientific analysis by its experts in chemistry and pharmacology, PB-22 and 5F-PB-22 are controlled substance analogues, as defined in 21 U.S.C. § 802(32)(A), of the Schedule I controlled substance JWH 018.[2]  As such, before February 10, 2014, 21 U.S.C. § 813 provided that PB-22 and 5F-PB-22, to the extent they were intended for human consumption, shall have been treated as Schedule I controlled substances.

---

[2] 1-pentyl-3-(1-naphthoyl)indole.

4

13.     On February 10, 2014, through the DEA's emergency scheduling authority under 21 U.S.C. § 811(h)(2), PB-22 and 5F-PB-22 were designated as Schedule I controlled substances under the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*[3]

### AB-FUBINACA

14.     AB-FUBINACA is the common short name for the chemical compound *N*-(1-amino-3-methyl-1-oxobutan-2-yl)-1-(4-fluorobenzyl)-1*H*-indazole-3-carboxamide.

15.     On February 10, 2014, through the DEA's emergency scheduling authority under 21 U.S.C. § 811(h)(2), AB-FUBINACA was designated as a Schedule I controlled substance under the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*[4]

### Smokeable Synthetic Cannabinoid Products

16.     Based on my training and experience I know that several years ago, individuals began to manufacture and traffic in smokeable synthetic cannabinoid ("SSC") products, of which two of the past popular brand names were "Spice" and "K2." SSC products are a mixture of an organic carrier medium, such as the herb-like substance damiana, which is then mixed with one or more synthetic cannabinoid compounds, such as AB-FUBINACA, PB-22, and 5F-PB-22.

17.     SSC products are commonly sold in head shops, tobacco shops, convenience stores, adult stores, and over the Internet. They are often marketed as incense, potpourri, or "fake weed," and their packages often carry the markings "not for human consumption." Distributors of these SSC products use these product names and markings in an attempt to disguise the nature and intended use of the SSC products. Users of SSC products have reported

---

[3] 79 Fed. Reg. 7,577 (Feb. 10, 2014).
[4] 79 Fed. Reg. 7,577 (Feb. 10, 2014).

intense hallucinogenic effects including, but not limited to, paranoia, panic attacks, increased heart rate, hallucinations, and increased blood pressure.

**The Investigation**

**The Smoke Shop LLC**

18.     The Smoke Shop LLC (hereinafter "The Smoke Shop") is a limited liability company ("LLC") registered in the State of Wisconsin.  The Smoke Shop is owned by David Yarmo and Erin Yarmo.

19.     Since at least March 28, 2012, The Smoke Shop has operated a retail store located at 127 Park Place, in the city of Delavan, Walworth County, Wisconsin (hereinafter "The Smoke Shop's retail location"), which is located within the Eastern District of Wisconsin.

20.     The Smoke Shop sells, or has previously sold, tobacco products, clothing, health drinks, pipe tools, smoking accessories, bumper stickers, costume jewelry, bags, and incense.[5]

21.     In 2012, the WCDEU and DEA initiated an investigation related to The Smoke Shop.  Investigators believed that The Smoke Shop was also selling SSCs containing Schedule I controlled substances or their analogues mislabeled and disguised as herbal incense or potpourri.

**Controlled Purchases**

22.     On August 16, 2013, a WCDEU confidential informant ("CI") made a controlled purchase of SSC from The Smoke Shop's retail location.  The CI purchased a packet of the SSC product MJ Wild Cherry and turned it over to WCDEU investigators.  The packet was sent to the Wisconsin State Crime Laboratory ("WSCL") for analysis, which determined that the product contained PB-22, a controlled substance analogue of JWH-018, which is a Schedule I controlled substance.

---

[5]  From February 7, 2014, through April 4, 2014, The Smoke Shop's retail location was open for business from Monday through Saturday.  It was closed on Sundays.

Case 2:14-cv-00854-JPS   Filed 07/21/14   Page 6 of 23   Document 1-1

23.     On February 21, 2014, a WCDEU CI made a controlled purchase of SSC from The Smoke Shop's retail location.  The CI purchased a packet of the SSC product MJ Wild Cherry and turned it over to WCDEU investigators.  The packet was sent to the WSCL for analysis, which determined that the product contained AB-FUBINACA, which is a Schedule I controlled substance.

24.     On March 13, 2014, a WCDEU CI made a controlled purchase of SSC from The Smoke Shop's retail location.  The CI purchased one packet of MJ Wild Cherry and one package of one packet of High Ace Blueberry and turned them over to WCDEU investigators.  The CI told investigators that Erin Yarmo was the individual who physically handed the CI the SSC packets.  The packets were sent to the WSCL for analysis, which determined that the sample of MJ Wild Cherry contained AB-FUBINACA and the sample of High Ace Blueberry contained PB-22.[6]  Both AB-FUBINACA and PB-22 were emergency scheduled by the DEA on February 10, 2014, and, accordingly, were Schedule I controlled substances when the CI purchased SSC products containing these substances from The Smoke Shop's retail location on March 13, 2014.

**Execution of Search Warrants on April 3 and 4, 2014**

25.     On April 3 and 4, 2014, the Walworth County Circuit Court issued search warrants authorizing searches of the following locations:

    A.      The Smoke Shop's retail location;

    B.      Account number ending in 6358 held at Walworth State Bank, 105 North Highway 67 in the Village of Walworth, County of Walworth, State of Wisconsin, which is within the Eastern District of Wisconsin; and

---

[6] Quinolin-8-yl 1-pentyl-1*H*-indole-3-carboxylate

C.  Account number ending in 1625 held at Walworth State Bank, 105 North Highway 67 in the Village of Walworth, County of Walworth, State of Wisconsin, which is within the Eastern District of Wisconsin.

26.  On April 4, 2014, WCDEU investigators, along with the DEA, executed the search warrant at The Smoke Shop's retail location. Pursuant to the warrant, investigators seized SSC products, which were later sent to the WSCL for testing and analysis. Investigators also seized invoices for SSC products sold and shipped to The Smoke Shop. Several seized invoices showed that The Smoke Shop had purchased several SSC products that contained AB-FUBINACA on or after February 7, 2014, even though AB-FUBINACA was emergency scheduled on February 10, 2014. Several other seized invoices showed that between May 21, 2013, and September 3, 2013, The Smoke Shop had purchased several SSC products that contained PB-22 or 5F-PB-22, controlled substance analogues.

27.  It was apparent to The Smoke Shop, David Yarmo, and Erin Yarmo that certain of the SSC products they had purchased contained AB-FUBINACA, PB-22, 5F-PB-22, or a combination of those synthetic cannabinoids because invoices for SSC products containing one or more of those synthetic cannabinoid compounds were found in The Smoke Shop's retail location during execution of the search warrant and those invoices were found stapled to, in the same folder as, or otherwise in close proximity to the lab reports indicating that certain SSC products contained one or more of those synthetic cannabinoid compounds.

28.  The WSCL analyzed the samples seized from The Smoke Shop's retail location on April 4, 2014. The following products that The Smoke Shop bought from Catch Point Services LLC ("Catch Point"), shipped to The Smoke Shop, and seized during the warrant, were found to contain AB-FUBINACA: MJ Peppermint, MJ Primo, MJ Puffy, MJ VooDoo, MJ Wild Cherry, and MJ Wow.

8

29.     On or about April 4 and 5, 2014, WCDEU investigators executed the search warrants on account numbers ending in 6358 and 1625, respectively, held at Walworth State Bank, 105 North Highway 67 in the Village of Walworth, County of Walworth, State of Wisconsin, and seized the contents of the accounts.  Walworth State Bank withdrew the funds from the accounts and converted them to two cashier's checks payable to the U.S. Marshals Service in the amounts of $407,947.47 and $318,443.02, respectively.  Those checks were processed as seizures for administrative forfeiture by the DEA.

**Witness Interviews**

30.     Agents conducted interviews of several witnesses related to The Smoke Shop, David Yarmo, and Erin Yarmo.

A.     Witness 1 stated the following:  Witness 1 had purchased SSC from The Smoke Shop every day or every other day starting in early 2014.  Witness 1 was surprised when Witness 1 had quickly become addicted to the SSC products because Witness 1 had used marijuana in the past with no addiction issues and the SSC product was clearly marketed as being marijuana-like.  Witness 1 believed that the SSC package labeling that stated the product was not for human consumption was an attempt to give the seller legal cover.  Witness 1 stated that in the mornings, there would be long lines of customers at The Smoke Shop who were waiting to purchase SSC.  Witness 1 had heard several customers request to be fronted[7] SSC product.

B.     Witness 2 stated the following:  Witness 2 had first been introduced to SSC products by Witness 2's girlfriend in August 2012.  Witness 2's girlfriend was a heavy smoker of SSC and was addicted to the product.  When Witness 2's girlfriend ran out of SSC, the girlfriend had severe withdrawal symptoms.  To avoid withdrawal, Witness 2 began to purchase SSC from The Smoke Shop for his girlfriend.  Witness 2 had occasionally smoked the SSC and described the effects as more powerful than crack cocaine.  Witness 2 stated that between April and June of 2013, Witness 2 had spent an average of $100 per week on SSC from The Smoke Shop.

i.     Witness 2 had conversations with David Yarmo.  On one occasion, Yarmo told Witness 2 that Yarmo had made $9,000 the day before

---

[7] A common practice in the illegal drug trade where drugs are provided to customers on credit for later payment.

from selling SSC products. Yarmo took Witness 2 into a back room of The Smoke Shop and showed Witness 2 a shipment of SSC that Yarmo had just received. Witness 2 described the shipment as enough product to cover a pool table, and stated that Yarmo told Witness 2 that Yarmo would sell all the SSC within three days.

ii.      On one occasion, Witness 2 had asked Yarmo whether Yarmo felt that Yarmo was putting himself at risk by selling SSC on credit and by barter. Yarmo stated that everyone knew the SSC was not being used as incense, as the product had been labeled and marketed, and that everyone was smoking the product. Yarmo told Witness 2 that to stay out of trouble, Yarmo had to pretend that the SSC was not being smoked. Yarmo stated that people were not allowed to talk in the shop about smoking the product. Yarmo stated that Yarmo had spent hours every day going through legal paperwork to ensure that SSC was available for Witness 2 and Witness 2's friends to smoke.

iii.     Witness 2 had a conversation with Yarmo in 2013 in which Yarmo said words to the effect: "We all know what this stuff is for, but don't bring it up in the store or I can't sell it."

C.      Witness 3 stated the following: Witness 3 was a former employee of The Smoke Shop who worked there for several days in early 2014. Witness 3 stated that the SSC product was labeled as incense or potpourri but Witness 3 knew that the product had an illicit purpose since the "incense" was much more expensive than the type of incense one would buy in a normal housewares store. Witness 3 knew the product had been smoked, in part, because the packaging of the SSC products made references to marijuana.

i.      On one occasion, Witness 3 saw a manager at The Smoke Shop kick several customers out of the store. When Witness 3 asked the manager why the manager had kicked out paying customers, the manager told Witness 3 that customers were not allowed in the store if the customers spoke about abusing the products sold there.

**Financial Analysis**

**Calculation of Total Drug Proceeds from The Smoke Shop's sales of SSC Products Containing the Schedule I Controlled Substance Analogues PB-22 and 5F-PB-22**

31.     From approximately May 21, 2013, through April 4, 2014, David Yarmo, Erin

Yarmo, and The Smoke Shop generated an estimated $407,947.47 in proceeds from the sales of

10

SSC products containing PB-22 and 5F-PB-22, in violation 21 U.S.C. §§ 802(32)(A), 813, 841, and 846.

      32.     I analyzed the invoices seized during the search warrant executed on April 4, 2014, at The Smoke Shop's retail location. According to the invoices and lab reports accompanying the invoices, from May 21, 2013, through September 30, 2013, The Smoke Shop had ordered the following products containing PB-22 or 5F-PB-22:

| DATE | VENDOR | DESCRIPTION | SIZE (g) | QUANTITY |
|---|---|---|---|---|
| 05/21/2013 | Catch Point | MJ Legit | 0.25 | 50 |
| 05/21/2013 | Catch Point | MJ Irie | 3 | 1000 |
| 05/23/2013 | Catch Point | MJ Wow | 1 | 300 |
| 05/23/2013 | Catch Point | MJ Irie Plus | 3 | 6 |
| 05/23/2013 | Catch Point | MJ Wow | 3 | 500 |
| 05/23/2013 | Catch Point | MJ Mint | 5 | 500 |
| 06/26/2013 | Elite Dist. | Buddah | Unknown | 1815 |
| 07/05/2013 | Catch Point | MJ Irie | 3 | 1414 |
| 07/05/2013 | Catch Point | MJ Wow | 3 | 1500 |
| 07/16/2013 | Catch Point | Primo | 2 | 400 |
| 07/16/2013 | Catch Point | VooDoo | 2 | 300 |
| 07/16/2013 | Catch Point | Peppermint | 3 | 250 |
| 07/16/2013 | Catch Point | MJ Wow | 5 | 300 |
| 08/06/2013 | Catch Point | MJ Irie | 1 | 200 |
| 08/06/2013 | Catch Point | MJ Wow | 1 | 200 |
| 08/06/2013 | Catch Point | Primo | 2 | 250 |
| 08/06/2013 | Catch Point | MJ Irie | 3 | 500 |
| 08/06/2013 | Catch Point | MJ Wow | 3 | 750 |
| 08/06/2013 | Catch Point | MJ Wow | 5 | 300 |
| 08/19/2013 | Catch Point | MJ Wow | 1 | 500 |
| 08/19/2013 | Catch Point | VooDoo | 2 | 300 |
| 08/19/2013 | Catch Point | MJ Irie | 3 | 1000 |
| 08/19/2013 | Catch Point | MJ Wow | 3 | 1200 |
| 08/20/2013 | Catch Point | MJ Wow | 5 | 500 |
| 09/03/2013 | Elite Distr. | Ex. Coconut Twist | 1 | 1122 |
| 09/03/2013 | Elite Distr. | Ex. Juicy fruit | 1 | 1100 |
| 09/03/2013 | Elite Distr. | Ex. Sexy Strawberry | 1 | 1100 |
| 09/03/2013 | Elite Distr. | Exotic Apple | 1 | 1122 |
| 09/30/2013 | Elite Distr. | Ex. Coconut Twist | 1 | 1100 |
| 09/30/2013 | Elite Distr. | Ex. Juicy Fruit | 1 | 1100 |
| 09/30/2013 | Elite Distr. | Ex. Sexy Strawberry | 1 | 1144 |

| 09/30/2013 | Elite Distr. | Exotic Apple | 1 | 1100 |

33.     I estimated the total gross proceeds that The Smoke Shop had earned by selling these products containing PB-22 or 5F-PB-22.  Specifically, I analyzed the invoices to determine how much product The Smoke Shop had ordered and I used the estimated retail price of each item to determine the total proceeds possible per order that The Smoke Shop made from May 21, 2013, through September 30, 2013.  I estimated that The Smoke Shop earned approximately $407,947.47 from selling the SSC products containing PB-22 and 5F-PB-22 that The Smoke Shop had ordered between May 21, 2013, and September 30, 2013.  I calculated this total as follows:

| PRODUCT | SIZE (g) | QTY | UNIT PRICE | RETAIL PRICE | TOTAL RETAIL PRICE | TOTAL |
|---|---|---|---|---|---|---|
| **Buddah** | | | | | | |
| | Unknown | 1815 | 2.75 | 9.99 (est.) | 18,131.85 | |
| **Ex. Coconut Twist** | | | | | | |
| | 1 | 2222 | 2.25 | 9.99 (est.) | 22,197.78 | |
| **Ex. Juicy fruit** | | | | | | |
| | 1 | 2200 | 2.25 | 9.99 (est.) | 21,978.00 | |
| **Ex. Sexy Strawberry** | | | | | | |
| | 1 | 2244 | 2.25 | 9.99 (est.) | 22,417.56 | |
| **Exotic Apple** | | | | | | |
| | 1 | 2222 | 2.25 | 9.99 (est.) | 22,197.78 | |
| **Legit** | | | | | | |
| | 2 | 300 | 5.5 | 9.99 (est.) | 2,997.00 | |
| **MJ Irie** | | | | | | |
| | 1 | 200 | 3.5 | 15.95 | 3,190.00 | |
| | 3 | 3920 | 8 | 22.95 | 89,964.00 | |
| **MJ Mint** | | | | | | |
| | 5 | 500 | 14.5 | 40.00 (est.) | 20,000.00 | |
| **MJ Wow** | | | | | | |
| | 1 | 1000 | 3.5 | 9.99 (est.) | 9,990.00 | |
| | 3 | 3950 | 8 | 22.95 (est.) | 90,652.50 | |
| | 5 | 1100 | 12.5 | 40 (est.) | 44,000.00 | |
| **Peppermint** | | | | | | |
| | 3 | 250 | 8 | 22.95 (est.) | 5,737.50 | |

12

| | | | | | |
|---|---|---|---|---|---|
| **Primo** | | | | | |
| | 2 | 650 | 5.5 | 29.99 | 19,493.50 |
| **VooDoo** | | | | | |
| | 2 | 600 | 5.5 | 25.00 | 15,000.00 |
| | | | | | $ 407,947.47 |

**Calculation of Total Drug Proceeds from The Smoke Shop's sales of SSC Products Containing the Schedule I Controlled Substance AB-FUBINACA**

34. From approximately February 10, 2014, through April 4, 2014, David Yarmo, Erin Yarmo, and The Smoke Shop generated approximately $318,443.02 in proceeds from the sales of SSC products containing AB-FUBINACA, in violation 21 U.S.C. §§ 841 and 846.

35. I analyzed the invoices seized during the search warrant executed on April 4, 2014, at The Smoke Shop's retail location. Even though AB-FUBINACA was scheduled on February 10, 2014, I included a purchase order placed February 7, 2014, in my proceeds analysis because even though the order was placed on February 7, 2014, the earliest it would have been delivered would have likely been February 8, 2014, a Saturday. It is likely that The Smoke Shop would have sold most, if not all of the product containing AB-FUBINACA that the store had ordered on February 7, 2014, on or after February 10, 2014, because the store was closed on Sundays.

36. From February 7, 2014, through April 4, 2014, The Smoke Shop had ordered from Catch Point the following products containing AB-FUBINACA:

| DATE | DESCRIPTION | GRAM SIZE | QUANTITY |
|---|---|---|---|
| 02/07/2014 | MJ Peppermint | 1 | 500 |
| 02/07/2014 | MJ Peppermint | 3 | 1000 |
| 02/07/2014 | MJ Puffy | 1.5 | 300 |
| 02/07/2014 | MJ Wild Cherry | 1 | 2000 |
| 02/07/2014 | MJ Wow | 1 | 2000 |
| 02/07/2014 | MJ Wow | 5 | 500 |
| 02/07/2014 | MJ Wow | 3 | 2000 |
| 02/26/2014 | MJ Peppermint | 1 | 800 |
| 02/26/2014 | MJ Peppermint | 3 | 300 |

13

| 02/26/2014 | MJ Primo | 2 | 400 |
|---|---|---|---|
| 02/26/2014 | MJ VooDoo | 2 | 300 |
| 02/26/2014 | MJ Wild Cherry | 1 | 1000 |
| 02/26/2014 | MJ Wow | 1 | 300 |
| 02/26/2014 | MJ Wow | 5 | 500 |
| 02/26/2014 | MJ Wow | 3 | 1800 |
| 03/13/2014 | MJ Peppermint | 3 | 1000 |
| 03/13/2014 | MJ VooDoo | 2 | 500 |
| 03/13/2014 | MJ Wild Cherry | 1 | 2000 |
| 03/13/2014 | MJ Wow | 5 | 1000 |
| 03/13/2014 | MJ Wow | 3 | 3000 |
| 03/28/2014 | MJ Irie | 3 | 2000 |
| 03/28/2014 | MJ Wild Cherry | 1 | 1500 |
| 03/28/2014 | MJ Wow | 3 | 500 |

37.     I estimated the gross proceeds that The Smoke Shop earned by selling the SSC products containing AB-FUBINACA, and that The Smoke Shop had ordered between February 7, 2014, and April 4, 2014.  I did so by analyzing the invoices to determine how much product The Smoke Shop had ordered and by using the estimated retail price of each item to determine the total proceeds possible per order, and then subtracting the unsold product seized by the WCDEU and DEA on April 4, 2014.  I determined that The Smoke Shop had earned approximately $318,443.02 from selling those products containing AB-FUBINACA.  I calculated this total as follows:

| | SIZE (g) | QTY | RETAIL PRICE | TOTAL RTL. PRICE | TOTALS |
|---|---|---|---|---|---|
| **MJ Wow** | | | | | |
| | 1 | 2300 | $9.99  (est.) | $22,977.00 | |
| | 3 | 7300 | $22.95  (est.) | $167,535.00 | |
| | 5 | 2000 | $39.95  (est.) | $79,900.00 | |
| **MJ Wow Subtotal** | | | | $270,412.00 | |
| Less: | | | | | |
| Unsold pdct sz 4/4/2014 | Avg. | 2453 | $23.32  (avg.) | $57,203.96 | |
| **MJ Wow Total** | | | | | $ 213,208.04 |
| | | | | | |
| **MJ Peppermint** | | | | | |
| | 1 | 1300 | $9.99  (est.) | $12,987.00 | |
| | 3 | 2300 | $22.95  (est.) | $52,785.00 | |

14

| | | | | | |
|---|---|---|---|---|---|
| **Peppermint Subtotal** | | | | $65,772.00 | |
| Less: | | | | | |
| Unsold pdct sz 4/4/2014 | 1 | 998 | $9.99 (est.) | $9,970.02 | |
| **MJ Peppermint Total** | | | | | $ 55,801.98 |
| | | | | | |
| **MJ VooDoo** | | | | | |
| | 2 | 800 | $25.00 | $20,000.00 | |
| Less: | | | | | |
| Unsold pdct sz 4/4/2014 | 2 | 501 | $25.00 | $12,525.00 | |
| **MJ VooDoo Total** | | | | | $ 7,475.00 |
| | | | | | |
| **MJ Wild Cherry** | | | | | |
| Wild Cherry | 1 | 6500 | $9.99 | $64,935.00 | |
| Less: | | | | | |
| Unsold pdct sz 4/4/2014 | 1 | 2300 | $9.99 | $22,977.00 | |
| **MJ Wild Cherry Total** | | | | | $ 41,958.00 |
| | | | | | |
| **Grand Total** | | | | | **$ 318,443.02** |

## The Smoke Shop's Bank Accounts

38.     Walworth State Bank account ending in 6358 is a business checking account titled to "The Smoke Shop LLC." It was opened on December 22, 2006, and the authorized signers for the account are David Yarmo and Erin Yarmo.

39.     Walworth State Bank account ending in 1625 is a business savings account titled to "The Smoke Shop LLC." It was opened on March 19, 2012, and the authorized signers for the account are David Yarmo and Erin Yarmo.

## The Deposit and Concealment of Drug Proceeds

40.     David Yarmo, Erin Yarmo, The Smoke Shop, and their representatives publicly advertised and promoted the legal activities of The Smoke Shop, while denying that they sold illegal products at the store.

41.     I estimate that between February 10, 2014, and April 4, 2014, The Smoke Shop, David Yarmo, and Erin Yarmo earned approximately $318,443.02 in illegal proceeds from the

15

sales of SSC products containing the Schedule I controlled substance AB-FUBINACA. I further estimate that between May 21, 2013, and September 30, 2013, The Smoke Shop, David Yarmo, and Erin Yarmo earned approximately $407,947.47 in illegal proceeds from the sales of SSC products containing the Schedule I controlled substance analogues PB-22 and 5F-PB-22. I believe that most, if not all, of these proceeds were deposited into WSB6358 from May 21, 2013, through April 4, 2014, along with the proceeds of other presumably legal items that David Yarmo and Erin Yarmo sold at The Smoke Shop, in part, for the purpose of concealing the nature and source of the drug proceeds deposited into the account. As such, the funds on deposit in WSB6358 are subject to forfeiture to the United States as property involved in concealment money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

42. On November 21, 2012, David Yarmo executed a declaration, which was filed with the Court,[8] in which he made the following statements:

A. "Our incense products are lawful and are sold for the lawful purpose of burning to give off pleasurable odors."

B. "Incense has been used since the beginning of recorded history… used in Catholic Sunday services… It is thus a very legitimate product with a long history."

C. "[Incense] is a well-accepted air-freshener or deodorant to eliminate unpleasant odors such as those caused [sic] cat litter, other pet activity, stale cigar and cigarette smoke, or stale food odors… There is absolutely nothing inherently illegal about it."

D. "There is nothing inherently illegal about the selling of our products. Whatever they contain, and we believe they contain no-marijuana-type products or other illegal substances, they are not sold by us to be smoked, but rather to be used in one of the many ways that have evolved over the centuries for incense burning."

E. "We are a popular store in and around the Delavan area and our customers include members of the local police department, attorneys and judges."

---

[8] *The Smoke Shop LLC v. United States of America,* 12-CV-1186 (E.D. Wis. Nov. 21, 2012)

16

F.	"We are law-abiding citizens and our shop complies with all local state and federal laws. [sic]"

43.	On May 13, 2014, David Yarmo and his attorney, Chris Kuehn, attended the Delavan Common Council meeting.  Attorney Kuehn, representing David Yarmo, publicly made the following comments:

A.	"[David Yarmo] serves a good deal of people in this community, in legitimate, legal products, law enforcement members included."

B.	"[David Yarmo] sells things there as [sic] clothing, tobacco, he gives away free books, soap, soda, things along those lines."

C.	"[David Yarmo] has always complied with the law."

D.	"[David Yarmo] has always complied with the law and sought to comply with the law."

44.	I submit that, because The Smoke Shop, LLC, David Yarmo, and Erin Yamro also sold legal products and held out their store as selling only legal products, they were able to conceal the nature, source, location, ownership, or control of the drug proceeds that they earned from their activities in violation of 21 U.S.C. §§ 802(32)(A), 813, 841, and 846 and deposits into the store bank accounts.  Had it not been for The Smoke Shop, David Yarmo, and Erin Yarmo's legal business activities and their commingling of drug proceeds with the monies earned from these legal activities, the scope, source, and nature of the estimated $726,390.49 in drug proceeds would have likely been more readily detected by Walworth State Bank, law enforcement, and others.  The Smoke Shop's legal activities likely also made it more difficult for Walworth State Bank to accurately comply with its legal requirements under 31 U.S.C. § 5318(g).  The commingling of legal and illegal proceeds by The Smoke Shop, David Yarmo, and Erin Yarmo made it harder for law enforcement to detect their illegal controlled substances and controlled substance analogues and it made their drug offenses easier to commit.

17

**Money Laundering in violation of 18 U.S.C. §§ 1956 and 1957**

45.     From approximately May 21, 2013, through April 4, 2014, David Yarmo, Erin Yarmo, and The Smoke Shop concealed the proceeds of the sales of SSC products containing the Schedule I controlled substance AB-FUBINACA and controlled substance analogues PB-22 and 5F-PB-22 by commingling the drug proceeds with monies legally earned by The Smoke Shop. This commingling of drug proceeds with monies legally earned by The Smoke Shop concealed the nature, source, location, ownership, or control of the drug proceeds. I submit that this activity was in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

46.     From approximately May 21, 2013, through April 4, 2014, David Yarmo, Erin Yarmo, and The Smoke Shop also knowingly engaged or attempted to engage in one or more monetary transactions of a value greater than $10,000 involving funds derived from specified unlawful activities, namely the proceeds of violations of 21 U.S.C. §§ 802(32)(A), 813, 841, and 846. I submit that this activity was in violation of 18 U.S.C. § 1957.

47.     From May 21, 2013, through April 4, 2014, The Smoke Shop, David Yarmo, and Erin Yarmo earned approximately $318,443.02 in illegal proceeds from the sales of SSC products containing the Schedule I controlled substance AB-FUBINACA, and $407,947.47 in illegal proceeds from the sales of SSC products containing the Schedule I controlled substance analogues PB-22 and 5F-PB-22. I believe these commingled proceeds were deposited into WSB6358.

48.     From June 7, 2013, through February 27, 2014, The Smoke Shop, David Yarmo, and/or Erin Yarmo made transfers and withdrawals of commingled funds that included proceeds from the sales of controlled substance analogues, in violation of 18 U.S.C. § 1957, as follows:

18

| DATE | SOURCE ACCT | DESTINATION | AMOUNT |
|---|---|---|---|
| 06/07/2013 | WSB6358 | WSB1625 | $ 50,000.00 |
| 06/25/2013 | WSB6358 | WSB1625 | $ 75,000.00 |
| 07/06/2013 | WSB6358 | Domsco LLC | $ 23,312.00 |
| 08/01/2013 | WSB6358 | Walworth State Bank (money order purchase) | $ 15,000.00 |
| 08/07/2013 | WSB6358 | Domsco LLC | $ 16,517.00 |
| 08/20/2013 | WSB6358 | Domsco LLC | $ 21,000.00 |
| 09/06/2013 | WSB6358 | WSB1625 | $ 100,000.00 |
| 09/09/2013 | WSB6358 | Elite Distributing | $ 10,059.00 |
| 10/02/2013 | WSB6358 | Elite Distributing | $ 10,059.00 |
| 10/09/2013 | WSB6358 | WSB1625 | $ 100,000.00 |
| 10/24/2013 | WSB6358 | WSB1625 | $ 50,000.00 |
| 10/29/2013 | WSB1625 | WSB6358 | $ 50,000.00 |
| 12/30/2013 | WSB1625 | Withdrawal ("David gift to Ryder" per transaction receipt) [9] | $ 14,000.00 |
| 12/30/2013 | WSB1625 | Withdrawal ("gift to Ryder from Erin" per transaction receipt)[7] | $ 14,000.00 |
| 12/30/2013 | WSB1625 | Withdrawal ("gift to Ethan from Erin" per transaction receipt)[7] | $ 14,000.00 |
| 12/30/2013 | WSB1625 | Withdrawal ("to Ethan from David" per transaction receipt)[7] | $ 14,000.00 |
| 02/27/2014 | WSB1625 | Walworth State Bank (Cashier's check) | $ 239,506.60 |

49.     Based on the information contained in this affidavit, I submit that the

approximately $404,802.42 in United States currency seized from WSB6358, and the

approximately $371,295.46 in United States currency seized from WSB1625, represent, or are

traceable to, the proceeds of the knowing or intentional trafficking in Schedule I controlled

substances, controlled substance analogues of Schedule I controlled substances, or both.  I

further submit that the approximately $404,802.42 in United States currency seized from

WSB6358, and the approximately $371,295.46 in United States currency seized from WSB1625,

were involved in transactions in violation of the Money Laundering Control Act, 18 U.S.C.

§§ 1956 and 1957.  For these reasons, the funds seized on or about April 4 and 5, 2014, from

---

[9] I believe these transactions were likely transfers of funds traceable to drug proceeds from The Smoke Shop's business savings account to David and Erin Yarmo's children's bank accounts, disguised as gifts.

accounts WSB6358 and WSB1625, respectively, are forfeitable to the United States under 18 U.S.C. §§ 981(a)(1)(A) and 984, and 21 U.S.C. § 881(a)(6).

**The Purchase of Parcel Number NA328000002**

50.     On February 27, 2014, $239,506.60 was withdrawn from WSB1625 and was used to purchase parcel number NA328000002. As described above in paragraphs 45 through 49, WSB1625 was funded by significant transfers from WSB6358, which funds represent, or are traceable to, the proceeds from the distribution of products containing Schedule I controlled substances, controlled substance analogues of Schedule I controlled substances, or both.

51.     Based on the information contained in this affidavit, I submit that the defendant real property commonly known as parcel number NA328000002 in Walworth County, Wisconsin, was purchased with proceeds traceable to an exchange of money for Schedule I controlled substances, controlled substance analogues of Schedule I controlled substances, or both. I further submit that the defendant real property was involved in transactions in violation of the Money Laundering Control Act, 18 U.S.C. §§ 1956 and 1957. For these reasons, the defendant real property commonly known as parcel number NA328000002 in Walworth County, Wisconsin, is forfeitable to the United States under 18 U.S.C. §§ 981(a)(1)(A) and 984, and 21 U.S.C. § 881(a)(6).

**Claims in Administrative Forfeiture Action**

52.     On or about April 17, 2014, DEA commenced an administrative forfeiture action against the defendant properties approximately $404,802.42 in United States currency seized from WSB6358 and the approximately $371,295.46 in United States currency seized from WSB1625.

20

53.     On or about May 8, 2014, "The Smoke Shop, Inc.," by and through its managing member, David Yarmo, filed a claim to the defendant properties approximately $404,802.42 in United States currency seized from WSB6358 and the approximately $371,295.46 in United States currency seized from WSB1625.

**Conclusion**

54.     Based on my training and experience, the information I have obtained during this investigation, and the facts contained in this affidavit, I submit that, during the time David Yarmo and Erin Yarmo sold products containing PB-22 and 5F-PB-22, David Yarmo and Erin Yarmo knew, should have known, or were deliberately indifferent to the fact, that PB-22 and 5F-PB-22:

    A.     Had chemical structures which were substantially similar to the chemical structure of JWH-018, a Schedule I controlled substance;

    B.     Had a stimulant, depressant, or hallucinogenic effect on the central nervous system that was substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect of JWH-018; or

    C.     With respect to a particular person, which such person represented or intended to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that were substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of JWH-018.

55.     Based on my training and experience, the information I have obtained during this investigation, and the facts contained in this affidavit, I submit that, during the time David Yarmo and Erin Yarmo sold SSC products containing PB-22 and 5F-PB-22, David Yarmo and Erin Yarmo:

    A.     Knew, should have known, or were deliberately indifferent to the fact, that the SSC products they sold containing PB-22 and 5F-PB-22 were intended for human consumption; or

B.          Intended the SSC products they sold containing PB-22 and 5F-PB-22 be consumed by humans.

56.     Based on my training and experience, and the information I have obtained during this investigation, I submit that the defendant properties approximately $404,802.42 in United States currency seized from WSB6358 and approximately $371,295.46 in United States currency seized from WSB1625 were used or intended to be used in exchange for Schedule I controlled substances, controlled substance analogues of Schedule I controlled substances, or both; represent proceeds of the knowing or intentional trafficking in Schedule I controlled substances, controlled substance analogues of Schedule I controlled substances, or both; or were used or intended to be used to facilitate knowing and intentional violations of Title II of the Controlled Substances Act, all in violation of 21 U.S.C. §§ 802(32)(A), 813, 841, and 846, and are therefore subject to forfeiture to the United States of America pursuant to Title 21, United States Code, Section 881(a)(6) and Title 18, United States Code, Section 984.

57.     Based on my training and experience, and the information I have obtained during this investigation, I further submit that the defendant real property commonly known as parcel number NA328000002 in Walworth County, Wisconsin, was purchased with proceeds traceable to an exchange of money for Schedule I controlled substances, controlled substance analogues of Schedule I controlled substances, or both, in violation of 21 U.S.C. §§ 802(32), 813, 841, and 846, and is therefore subject to forfeiture to the United States of America pursuant to Title 21, United States Code, Section 881(a)(6).

58.     Based on my training and experience, and the information I have obtained during this investigation, I further submit that the following defendant properties were involved in transactions or attempted transactions in violation of the Money Laundering Control Act, or are traceable to money laundering offenses, all in violation of 18 U.S.C. §§ 1956 and 1957, and are

22

therefore subject to forfeiture by the United States of America pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and 984:  Approximately $404,802.42 in United States currency from Walworth State Bank account ending in 6358, approximately $371,295.46 in United States currency from Walworth State Bank account ending in 1625, and certain real property commonly known as parcel number NA328000002 in Walworth County, Wisconsin.

                                                  s/DANIEL S. SCHMEICHEL
                                                  Daniel S. Schmeichel
                                                  Special Agent
                                                  IRS – Criminal Investigation

Subscribed and sworn to before me
this 21st day of July, 2014.


  s/CATHY L. TRAUTMAN
Notary Public, State of Wisconsin
My commission:  expires 08/30/15  .